IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 15, 2015

## MARCUS TERRELL CHURCH v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2009-A-583      J. Randall Wyatt, Jr., Judge**

---

**No. M2014-02342-CCA-R3-PC – Filed August 11, 2015**

---

The petitioner, Marcus Terrell Church, appeals the denial of post-conviction relief from his 2011 Davidson County Criminal Court jury convictions of aggravated robbery and especially aggravated kidnapping, claiming that he was denied the effective assistance of counsel. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Jeffrey T. Daigle, Nashville, Tennessee, for the appellant, Marcus Terrell Church.

Herbert H. Slatery III, Attorney General and Reporter; Ahmed A. Safeeullah, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Amy Hunter, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The evidence at the petitioner's jury trial revealed that, in the early morning hours of March 31, 2008, Byron Brandon stopped at Paul's Market to get gasoline for his car, but he changed his mind because the number of people at the market made him feel uncomfortable. *State v. Marcus Terrell Church*, No. M2011-01770-CCA-R3-CD, slip op. at 3 (Tenn. Crim. App., Nashville, June 10, 2013), *perm. app. denied* (Tenn. Nov. 13, 2013). Before Mr. Brandon could pull out of the parking lot, a man later identified as the petitioner approached Mr. Brandon's "open window with a gun and said, 'All right, we got ya.'" *Id.* The petitioner entered the passenger side of Mr. Brandon's vehicle and forced Mr. Brandon at gunpoint to turn over his Automatic Teller Machine ("ATM") card and cash. *Id.* The petitioner demanded that Mr. Brandon drive a short distance and then instructed Mr. Brandon to pull into an alley. *Id.* The petitioner then ordered Mr.

Brandon into the trunk of the vehicle. *Id.* The petitioner drove Mr. Brandon around for "at least four or five hours." *Id.* When Mr. Brandon heard people talking outside the vehicle, he "pulled an access latch in the tru[n]k and crawled into the backseat" of the vehicle. *Id.* The petitioner "ordered him back into the trunk and hit him on the head with the gun causing him to bleed." *Id.* Mr. Brandon complied, and when he again attempted to pull the access latch, he discovered "the seat had been secured with 'shoestrings' and would not fall down." *Id.* The petitioner eventually released Mr. Brandon somwehere in North Nashville. *Id.* The petitioner walked away, leaving Mr. Brandon's vehicle behind but stealing Mr. Brandon's cellular telephone, wallet, driver's license, and cash. *Id.*

Mr. Brandon drove to his mother's house and called 9-1-1. *Id.*, slip op. at 4. After speaking with law enforcement officers, Mr. Brandon was transported to the hospital by ambulance, and "he received three stitches for a cut on his elbow." *Id.* Mr. Brandon later viewed a photographic lineup and, "within approximately twenty seconds," positively identified the petitioner as his assailant, indicating that he was "one-hundred percent sure of his identification." *Id.*, slip op. at 4, 8.

Law enforcement officers conducted fingerprint analysis on Mr. Brandon's vehicle and determined that a right palm print matched that of the petitioner. *Id.*, slip op. at 6. Everett Brewer, a federal prison inmate who had agreed to cooperate with authorities by assisting with the arrest and conviction of others as part of his plea agreement, testified that he had previously been incarcerated with the petitioner and that the petitioner had discussed his case with Mr. Brewer:

> [The petitioner] told me that he had been doing powder cocaine and then when the cocaine and the money ran out that he went to a – I want to say a convenience store gas station that he was looking for somebody slipping, he said, that uh you know a lot of the little drug dealers were known to come to frequent that store and a lot of them had a tendency to pull up and get out of their cars and leave the vehicle running and left an opportunity for him to jump in the vehicle and take off, you know, strip the car for the rims, stereo system, whatever he could get out of it and he told me that while he was hanging out around the store that he ran in – he encountered an individual and he didn't tell me, you know, how he got [up on] the individual but he told me that he encountered the individual and that had took [sic] him at gun point, that they had left the store, and that he had took the individual and put him in the trunk of his car of the individual's car that he had taken and that they were riding around – that he was riding

- 2 -

around, driving around in the individual's car and at some point after he had put the individual in the trunk he heard a noise or happened to look in the rear-view mirror and noticed that the individual had, uh, had come from the trunk, was coming through the backseat, that somehow he had managed to maneuver the seat so he could come through there.

He told me that the pistol that he had laying on his lap that he kind of slowed down turned around and pointed the gun at the individual and when he wouldn't get, when the individual kept trying to come back he hit him a couple of times in the face or head area and pointed the gun at him again and made him get back and the individual retreated back into the trunk.

Shortly after he said that he pulled over and kind of fixed the seat back and then sometime after that that he was riding around and picked up a couple of his homeboys is what he said and I told him that, I made the statement that he was lucky that they didn't call his name, you know, say his name and said that they were calling him by his nickname which was Rell, that they never mentioned his real name, that they only said Rell.

They had rode around for a while getting high, snorting cocaine and eventually he dropped those two individuals off and went back to where he had his, in the vicinity of where he had his car parked, and said that after he had got out of the car that he had dropped the trunk where the individual was locked up at and proceeded to walk and got in his car and he left the individual.

*Id.*, slip op. at 6-7.

Detective Christopher Brennan testified that he ran the fingerprint "hit" from Mr. Brandon's vehicle "through our nickname database" based on Mr. Brandon's statement that he had heard the petitioner referred to as "Rell." *Id.*, slip op. at 8. Based on Detective Brennan's findings, he assembled a photographic lineup which included the petitioner's photograph and from which Mr. Brandon positively identified the petitioner as the perpetrator of the crimes against him. *Id.* Investigator Hugh Coleman subpoenaed

- 3 -

records from the petitioner's MySpace account and discovered that the petitioner's account nickname was "Rell." *Id.*, slip op. at 9.

Based on this evidence, a Davidson County Criminal Court jury convicted the petitioner as charged of one count of aggravated robbery and one count of especially aggravated kidnapping. *Id.*, slip op. at 1. The trial court imposed an effective sentence of 25 years' incarceration, and this court affirmed the judgments on direct appeal. *Id.*

On March 28, 2014, the petitioner filed, pro se, a timely petition for post-conviction relief. Following the appointment of counsel and the amendment of the petition, the post-conviction court held an evidentiary hearing on October 23, 2014.

The petitioner testified that he recalled a pretrial hearing at which trial counsel argued against allowing references to a "nickname database" at trial, and he recalled that the trial court ruled that witnesses "should not refer to this nickname database being based on arrests and that witnesses should kind of give a generic description of the database." The petitioner testified that, at trial, Detective Brennan stated that he had discovered the petitioner's identity through this nickname database and that Detective Brennan had given a detailed description of the database. The petitioner stated that trial counsel did not object to the admission of this testimony or move for a mistrial and that, instead, trial counsel "just let it go." On cross-examination, the petitioner admitted that both Investigator Coleman and Mr. Brewer testified at trial that the petitioner's nickname was "Rell," and the petitioner conceded that his palm print was discovered on Mr. Brandon's vehicle.

Trial counsel testified that he had filed a motion in limine to exclude any reference to the nickname database on the basis of hearsay. Upon reviewing the case file, trial counsel recalled that the trial court overruled his motion but did instruct the State that witnesses "shouldn't dwell or mention on it being something that people's names would get into through arrest." Trial counsel acknowledged that, at trial, Detective Brennan testified as follows:

> I started the investigation by first calling Mr. Brandon the night that I received the report, just to go over his side of the story and make sure it matched with what was on the report in the officer's report. The, that evening after I talked with him I went by the market to see if there was any surveillance video and they don't have any surveillance video there.

Then two nights later I received an email from the latent print section saying that they had received a fingerprint hit on the fingerprints that the crime scene officer lifted from Mr. Brandon's vehicle. I was able to run that name through our nickname database that is entered when people are arrested, if they have a nickname it goes in a database that we keep.

The nickname that Mr. Brandon had thought that he heard the suspect called while he was in the trunk of the car matched the nickname that the [petitioner] had used previously at one point in time, the nickname of Rell.

At that point I put together a photo line-up and called Mr. Brandon on the, I believe it was on the 7th and took that out and showed that to him where he positively identified the [petitioner] as the person that committed the crime against him. At that point I took warrants out on the [petitioner].

Trial counsel admitted that he did not object to Detective Brennan's mention of or explanation of the nickname database and that he did not move for a mistrial or request a curative instruction. Although trial counsel had no "independent recollection of that particular moment in the trial," he testified that it was his "common practice" to weigh whether something that might be "slightly prejudicial" to his client was worth "draw[ing] more attention to it by objecting" and allowing the jury to ponder "what is he trying to keep from me." Trial counsel continued his explanation as follows:

It is the type of thing that they are kind of knowing or assuming anyway, so I – I can't tell you if this is just something that was – that I missed for whatever reasons, but many times I am listening and I am on the edge of my seat and if it goes by quickly and you hope the jury doesn't focus on it you don't want to be objecting or saying give me a special instruction because the special instruction essentially reads disregard the portion of the Detective's testimony where he said, this came from an arrest databank at which point everyone in the jury has heard it again and that makes it pretty clear to them that is something that maybe it is important here, why, why would he want to disregard it and I understand that juries are presumed to follow the instructions, but I do think it is human nature when it is called to

> someone's attention multiple times or made a big deal of that
> it can be more harmful than – than beneficial to the client.

Trial counsel emphasized that he could not recall "whether [he] actually consciously engaged in that analysis in this case at that moment" but that he knew that "often times at trial we are making that exact calculation."

With this evidence, the post-conviction court denied relief. Although the court found that Detective Brennan's testimony did violate the trial court's order forbidding any reference to the way in which an individual's name appeared in the database, the court concluded that trial counsel's "failure to object or request a mistrial did not fall outside the range of competence demanded of attorneys in criminal cases." The court found that trial counsel's decision "was reasonable with respect to the objective standard used to evaluate attorney performance." Moreover, the post-conviction court found that, even if trial counsel's performance had been deficient, the petitioner failed to establish that he had been prejudiced by trial counsel's performance, considering that both Investigator Coleman and Mr. Brewer had testified that the petitioner's nickname was "Rell."

On appeal, the petitioner reiterates his claim of ineffective assistance of counsel, contending that trial counsel was ineffective by failing to object to Detective Brennan's testimony in which he referenced the nickname database.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2006). A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and

that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When reviewing a claim of ineffective assistance of counsel, we will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Claims of ineffective assistance of counsel are mixed questions of law and fact. *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010); *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the trial court's factual findings, our review is de novo, and the trial court's conclusions of law are given no presumption of correctness. *Fields*, 40 S.W.3d at 457-58; *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

In our view, the record unquestionably supports the post-conviction court's denial of relief. Even though trial counsel could not recall with any specificity the reason that he did not object to Detective Brennan's testimony, trial counsel's explanation that it was his practice to avoid calling unwanted attention to such fleeting testimony is certainly reasonable, and we will not second-guess this reasonable trial strategy. *See Adkins*, 911 S.W.2d at 347. Moreover, the petitioner's guilt was overwhelmingly established by fingerprint analysis, identification by the victim, and a third party's rendition of the petitioner's admission of guilt. Thus, the petitioner failed to establish that he was in any way prejudiced by Detective Brennan's testimony. *See Strickland*, 466 U.S. at 694. As such, we hold the petitioner has failed to prove by clear and convincing evidence that trial counsel's representation was deficient or prejudicial.

The petitioner failed to establish that he was denied the effective assistance of counsel at trial. Accordingly, the judgment of the post-conviction court is affirmed.

_____

JAMES CURWOOD WITT, JR., JUDGE